JACKSON LEWIS LLP
    59 Maiden Lane
    New York, New York 10038-4502
    (212) 545-4000
Attorneys of Record:
    Kevin G. Lauri (KL 8714)
    Peter C. Moskowitz (PM 8845)

ATTORNEYS FOR DEFENDANT
INTERNATIONAL BUSINESS MACHINES CORPORATION

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DAVID A. KAVITZ,<br><br>               Plaintiff,<br><br>vs.<br><br>INTERNATIONAL BUSINESS MACHINES<br>CORPORATION, a New York corporation,<br><br>               Defendant. | Case No. 09-CV-05710-CM<br><br>**DEFENDANT<br>INTERNATIONAL BUSINESS<br>MACHINE CORPORATION'S<br>LOCAL RULE 56.1<br>STATEMENT OF UNDISPUTED<br>MATERIAL FACTS** |

       Defendant International Business Machines Corporation ("IBM" or "Defendant") submits this Statement of Undisputed Material Facts, pursuant to Local Rule 56.1 of the United States District Court, Southern District of New York, in Support of Defendant's Motion for Summary Judgment.

    **A.**    **THE PARTIES**

       1.    Defendant IBM is a New York corporation and is headquartered in Armonk, New York. (Moskowitz Aff. ¶2).[1]

---

[1]    References to "Moskowitz Aff. __" are to the Affidavit of Peter C. Moskowitz, Esq., sworn to on February 24, 2010, and submitted herewith. References to "Guidotti Aff. __" are to the Affidavit of Robert Guidotti, sworn to on February 19, 2010, and submitted herewith. References to "Ex. __" are to the Exhibits attached to the Moskowitz Aff.

2.     Plaintiff is a current employee of IBM and presently resides in Atlanta, Georgia. (Pl. dep. 7).[2]

**B.     PLAINTIFF'S EMPLOYMENT WITH IBM**

**a.  Plaintiff's Hire**

3.     Plaintiff became an IBM employee in 2002 as a result of IBM's purchase of Informix. (Pl. dep. 20-21).

4.     Plaintiff, who had been assigned to the Motorola account by Informix in 2000, was the lead Informix salesperson selling data management software to Motorola. (Pl. dep. 11, 18, 21).

5.     IBM sold many other products to Motorola. (Flannery dep. 12).

**b.  IBM's Organizational Structure**

6.     In 2005 and 2006, Plaintiff's first line supervisor was Andre Temidis, the Channel Sales Manager – Central Region, Software Group. (Pl. dep. 87; Temidis dep. 10).

7.     Plaintiff's second-line manager was Hugh Flannery, Business Unit Executive, Americas Channels Software Sales. (Temidis dep. 9; Flannery dep. 11). Both Mr. Temidis and Mr. Flannery joined IBM from Informix in 2002. (Pl. dep. 20-21; Temidis dep. 8; Flannery dep. 10).

8.     Plaintiff's third-line manager was Denyse Cromwell-Mackey. (Flannery dep. 46). Ms. Cromwell reported to Karen Smith, the Vice President of Channel Sales for the

---

[2]     References to "Pl. dep at __" are to the deposition transcript of Plaintiff attached as Exhibit "EE" to the Moskowitz Aff.  References to "Flannery dep. __", Temidis dep. __", "Martinotti dep. __" and "Shanine dep. ___" are to the deposition transcripts of Hugh Flannery, Andre Temidis, Rick Martinotti and George Shanine and are attached as Exhibits "FF", "GG," "HH" and "II" to the Moskowitz Aff., respectively.

Software Group. Ms. Smith reported to Robert Guidotti, the Vice President of the Software Group. (Guidotti Aff. ¶2).

9.      In 2006, Mr. Guidotti had approximately 20 direct reports, including Steve Lautz, the Vice President of Information Management. Mr. Lautz' responsibilities included Channel Sales involving information or data management software. (Guidotti Aff. ¶2; Temidis dep. 75; Flannery dep. 49).

10.     In addition to the direct reporting relationships in the Software Group, pursuant to IBM's matrixed management structure, in 2005 and 2006, George Shanine, the Territory Sales Manager for the Central Region was also responsible for sales to Motorola. (Shanine dep. 9, 11).

11.     A finance team in the Software Group was responsible for setting incentive payments and quotas and reviewing commission payments. (Temidis dep. 26-27). Rick Martinotti was the Field Financial Sales Manager Software S&D North America. (Martinotti dep. 11). William Sullivan was the Controller AG Software Finance. (Martinotti dep. 20-21; Ex. Y).

12.     Both Mr. Martinotti and Mr. Sullivan reported to Mark Coyle, the Chief Financial Officer of the Software Group. (Martinotti dep. 19-21; Ex. U; Flannery dep. 39; Shanine dep. 28).

c.   **The Motorola Account**

13.     From 2002 to 2009, Plaintiff was the lead IBM salesperson selling OEM (original equipment manufacturer) data management software to Motorola. (Pl. dep. 9-11; Temidis dep. 28; Flannery dep. 12). Motorola was by far Plaintiff's largest account and nearly all of his sales were to Motorola. (Pl. dep. 11-12).

3

14.     OEM software products manufactured by IBM and sold to customers such as Motorola are incorporated within Motorola's specific applications, then re-sold to end-users under the Motorola brand name. (Pl. dep. 14-15).

15.     Motorola incorporated the data management software manufactured by IBM in software applications it in turn sold to wireless telephone companies, including Sprint. (Pl. dep. 15).

### i.     Motorola Purchased Software Licenses From IBM

16.     Pursuant to the parties' agreement that was drafted and entered into between Informix and Motorola (prior to IBM's purchase of Informix), Motorola purchased licenses from IBM to use the data management software.   (Pl. dep. 29-37).

17.     Motorola self-reported the number of licenses it needed, which was based on number of end-users of the software, and purchased additional licenses as needed. (Pl. dep. 35-36).

18.     Motorola purchased licenses at the end of each calendar year at a significant discount. (Pl. dep. 29-32; Temidis dep. 18-19).

19.     The vast majority of IBM's data management software sales to Motorola occurred in December of each year. (Pl. dep. 50-51, 56-57, 68).

### ii.    IBM's 2003 Compliance Audit of Motorola

20.     In 2003, Plaintiff proposed that IBM perform a compliance audit of Motorola. (Pl. dep. 38-39).

21.     IBM conducted the audit of Motorola, which included Dennis Allen, an engineer, running a software program, referred to as a script, on Motorola's computer to track the number of concurrent end-users of the data management software. (Pl. dep. 39-40).

4

22.     The audit resulted in a $3 million purchase of licenses by Motorola based on the additional number of concurrent users that were uncovered in the audit.   (Pl. dep. 44; Ex.DD).

23.     After the 2003 compliance audit of Motorola was completed, Plaintiff did not take any steps or institute any procedures to insure that Motorola accurately reported the number of licenses it was using going forward. (Pl. dep. 44-45).

### d.   Plaintiff's Compensation

24.     Plaintiff's compensation, as is generally the case with salespersons handling Software Group products, was based on a combination of base salary and incentive pay. (Pl. dep. 72; Ex. E; Guidotti Aff. ¶3).   Plaintiff's incentive compensation consisted primarily of commissions. (Ex. E).

25.     Plaintiff's yearly quota and commission rates, including accelerators, were set by the finance team.   (Temidis dep. 26-27).   Accelerators refer to increased commission percentages that apply to revenue in excess of certain thresholds set forth in the salesperson's incentive plan or quota letter. (Temidis dep. 77; Flannery dep. 32; Guidotti Aff. ¶4).

26.     In January of each year, Plaintiff received an incentive plan letter which included his target incentive compensation, sales quota and commission rates.   (Pl. dep. 81; Ex. A; Flannery dep. 32).

27.     Each incentive plan letter, including Plaintiff's 2006 Plan Letter, contained express language that it did not constitute a contract and that IBM retained the right to review and adjust the Incentive Plan, including Plaintiff's quota and commission rates. (Pl. dep. 72, 76-79; Temidis dep. 30-36; Ex. A).

28.     Plaintiff electronically received an incentive plan letter every year and e-mailed his acceptance of the terms of the incentive plan letter to Defendant.   (Pl. dep. 81; Exs. A & B).

29.     Plaintiff's compensation during the period between 2003 to 2007 was: (1)  2003 – $261,589 including commission payments in the amount of $170,623; (2) 2004 – $541,357 including commission payments in the amount of $446,851; (3) 2005 – $213,219 including commission payments in the amount of $113,973; (4) 2006 – $253,565 including commission payments in the amount of $158,110; and (5) 2007 – $229,803 including commission payments in the amount of $132,775. (Pl. dep. 178-80; Ex. E).

C.     **PLAINTIFF'S 2006 PLAN LETTER**

30.     In January 2006, Plaintiff electronically received his 2006 Incentive Plan Letter from IBM ("2006 Plan Letter").   The 2006 Plan Letter included a revenue quota of $1,725.806.00.  (Pl. dep. 73; Ex. A).

31.     Plaintiff's 2006 Plan Letter provided as follows with respect to its legal significance and IBM's right to modify or cancel both the Incentive Plan and the incentive payments thereunder:

> **Right to Modify or Cancel:**
> The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it.  IBM reserves the right to adjust the Plan terms, including but not limited to any quotas and target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related incentive payments have been earned under its terms.
>
> **Advances:**
> Periodic distributions you may receive under the Plan are advances paid to you prior to your earning of the incentive.  Because Incentive Plan quotas or similar sales objectives for annual plans are designed based on full year performance results, 2006 incentives are earned on January 31, 2007, provided the following conditions have been met: (1) you have complied with the Incentive plan; (2) you have not engaged in any fraud or misrepresentation relating to any of your sales

6

transactions or incentives; and (3) the customer has paid the invoice for the sales transaction related to your incentive. If any of the foregoing conditions have not been met, then the incentive is not earned. Deductions for overpayments may be made from advances paid to you up until the date those advances become earned incentives.

**Significant Transactions:**
IBM Management reserves the right to review and, in its sole discretion, adjust incentive payments associated with transactions: (1) which are disproportionate when compared with the territory opportunity or quota size; or (2) for which the incentive payments are disproportionate when compared with the individual's performance contribution toward the transactions.

(Ex. A).

32.     Plaintiff read his 2006 Plan Letter on-line including the disclaimers. (Pl. dep. 70).

33.     Plaintiff also received information about the 2006 Incentive Plan on-line, which included the same disclaimers that were in his 2006 Plan Letter. (Pl. dep. 60-64; Ex. D).

34.     Plaintiff accepted the terms of his 2006 Plan Letter and indicated his consent and acceptance by returning an electronic copy to Defendant. (Pl. dep. 70; Ex. C).

35.     Plaintiff understood that the 2006 Plan Letter did not constitute a contract with IBM. (Pl. dep. 76; Guidotti Aff. ¶7).

36.     Plaintiff also understood that IBM could change the Plan, his quota and the amount of his incentive payment, including if the amount of his commission was disproportionate to his quota under the Significant Transactions clause. (Pl. dep. 76-79, 83-85).

**D.     THE 2006 MOTOROLA AUDIT AND COMPLIANCE TRANSACTION**

37.     In the spring of 2006, Mr. Temidis, Plaintiff's supervisor, suggested to Plaintiff that IBM perform another compliance audit of Motorola. (Pl. dep. 87-138).

38.     Plaintiff told Mr. Temidis that he was concerned that it might upset Motorola. (Pl. dep. 87).

7

39.    Mr. Temidis made the decision to go forward and initiated the compliance audit of Motorola in the spring of 2006. (Pl. dep. 88-89, 138).

40.    Mr. Temidis contacted Jeri Savoy, the team leader of one of IBM's compliance teams, to assist the sales team in conducting the audit. (Pl. dep. 89; Temidis dep. 50-51).

41.    On May 9, 2006, Ms. Savoy sent Motorola a letter formally initiating the audit. (See Ex. K referencing Ms. Savoy's May 9th letter to Mr. Scheuermann).

42.    Two IBM engineers, Michael Terrell and Dennis Allen, spent a week at Motorola running software scripts on Motorola's mainframe to collect data on the number of concurrent users of the data management software. (Pl. dep. 97; Exs. G, H & I).

43.    The audit revealed that Motorola had been severely underreporting the number of concurrent users and therefore the number of software licenses it should have been purchasing from IBM. (Pl. dep. 99-100; Temidis dep. 52; Exs. K & L).

44.    On August 23, 2006, Ms. Savoy informed Motorola of IBM's initial audit findings. (Ex. K).

45.    Depending on how a concurrent user was defined, the number of concurrent users and corresponding number of licenses Motorola had underreported resulted in Motorola owing IBM between $6.4 and $77 million. (Pl. dep. 99-100; Exs. K & L).

46.    After months of negotiations, including face to face meetings, telephone calls and correspondence, Motorola and IBM agreed upon a $3.8 million payment as a result of Motorola having underreported the number of licenses it had used during the period 2004 through 2006. (Pl. dep. 90, 92, 94-95, 97-118; Temidis dep. 49, 56, 60, 65; Exs. G to R).

47.     In addition to Plaintiff, the following IBM employees participated in the compliance audit of Motorola:  (1) Jeri Savoy - - lead on the compliance team - - she sent the initial audit letter, informed Motorola of IBM's initial findings and participated in meetings, telephone conversations and correspondence with various Motorola employees; (2) Michael Terrell - - IBM IT Specialist - - he ran the scripts at Motorola with Dennis Allen; (3) Dennis Allen - - IBM Engineer on Motorola accountant - - he ran the scripts with Mr. Terrell; (4) Andre Temidis - - Plaintiff's supervisor - - he initiated the audit, reviewed the data, and was involved in direct negotiations with Mark Ennis of Motorola and internal IBM strategy and negotiating meetings; (5) Hugh Flannery - - Plaintiff's second line manager - - he was involved in one meeting with Motorola and internal IBM strategy and negotiating meetings; (6) George Shanine - - the Territory Sales Manager for Central Region - - he attended one meeting with Motorola; (7) Victor Cohen - - IBM attorney - - he provided legal advice in connection with the negotiations; and (8) Steve Lautz - - IBM Vice President - - he signed off on and closed the deal with Motorola Vice President, Fred Wright.  (Pl. dep. 89-90, 92, 94-95, 97-118, 130-150; Temidis dep. 49, 56, 60, 65; Exs. G to R).

48.     Motorola paid IBM $3.8 million for additional software licenses as a result of the compliance audit that uncovered Motorola's three years of underreporting the number of licenses it was using. (Pl. dep. 119; Ex. S).

### E.     IBM'S CALCULATION OF PLAINTIFF'S COMMISSION UNDER ITS 2006 INCENTIVE PLAN

49.     Pursuant to the express terms of IBM's 2006 Incentive Plan, incentive payments (commissions) for transactions closed in 2006 were not earned until January 31, 2007 and the satisfaction of three conditions not relevant here.  Specifically, Plaintiff's 2006 Plan Letter stated in pertinent part: "Because Incentive Plan quotas or similar sales objectives for

9

annual plans are designed based on full year performance results, 2006 incentives are earned on January 31, 2007...." (Ex. A).

50.    Accordingly, IBM expressly retained the right to adjust Plaintiff's commission until at least January 31, 2007. (Guidotti Aff. ¶6; Temidis dep. 30-36; Shanine dep. 21, 23; Ex. A).

51.    Pursuant to the Software Group's policies and procedures with respect to commission payments, all commission checks over $14,000 are subject to additional review and validation. (Guidotti Aff. ¶8; Temidis dep. 59-60; Flannery dep. 35).

52.    In December 2006, the finance group received a monthly report reflecting all commission checks over $14,000 for the month of November. (Ex. U; Guidotti Aff. ¶9).

53.    Plaintiff's potential commission on the Motorola transaction in the amount of $333,192.08 (if calculated with accelerators for exceeding quota by applying higher commission rates) was included on this report known as the "top or big" check report. (Ex. U; Guidotti Aff. ¶9).

54.    Mark Coyle, the C.F.O. of the Software Group, reviewed the big check report and asked Mr. Martinotti why Plaintiff was receiving such a large check. (Martinotti dep. 19; Ex. U).

55.    Mr. Martinotti forwarded Mr. Coyle's inquiry to Mr. Sullivan, who was responsible for assisting the Channels sales managers in their review of large commissions. (Martinotti dep. 20-22; Ex. U).

56.    As the Motorola compliance transaction resulted in Plaintiff's revenue for 2006 being 236.49% of his assigned quota, Mr. Sullivan initiated discussions with Plaintiff's

management team concerning the transaction and the amount of Plaintiff's commission. (Flannery dep. 46; Ex. T; Temidis dep. 71-72, 75-76, 78-79; Guidotti Aff. ¶10).

57.     Mr. Temidis confirmed to the commission team within the finance group that the amount of the transaction and Plaintiff's quota number were numerically accurate. (Temidis dep. 71-72; Ex. S).

58.     After numerous discussions, which included Mr. Temidis, Mr. Flannery, Mr. Sullivan, Ms. Cromwell, Mr. Lautz, Mr. Coyle and Mr. Guidotti, IBM made a decision with respect to the calculation and amount of Plaintiff's commission.  (Temidis dep. 75-76, 78-79; Exs. S to AA; Flannery dep. 46, 56; Guidotti Aff. ¶¶9-11).

59.     Specifically, Mr. Flannery, based on his discussions with his supervisors and Mr. Sullivan, recommended, and Mr. Guidotti ultimately decided, to pay Plaintiff a commission on the full amount of the 2006 Motorola compliance transaction at Plaintiff's regular commission rate without any accelerators.  (Flannery dep. 46-49; Guidotti Aff. ¶10; Ex. V; Temidis dep. 75-76, 78-79).

60.     IBM decided to calculate Plaintiff's commission without accelerators because it was a compliance transaction that included payments over a three year period that were not new revenue and therefore not incorporated in the quota that had been set for Plaintiff for 2006.  (Flannery dep. 46-47; Guidotti Aff. ¶11; Temidis dep. 78-79).  Accordingly, the amount of the commission with accelerators was disproportionate to Plaintiff's quota.  (Guidotti Aff. ¶11).

61.     If Motorola had properly self-reported its license usage during the three-year period or Plaintiff had been on top of the issue, the revenue IBM received each year would

have been included in Plaintiff's quota for the following year and the large compliance transaction in 2006 would not have occurred. (Flannery dep. 46; Guidotti Aff. ¶11; Ex. V).

62.     The decision to adjust Plaintiff's incentive payment commission was not unique and was expressly authorized by IBM's 2006 Incentive Plan and Plaintiff's 2006 Plan Letter. IBM has adjusted incentive payments downward on numerous occasions, including, but not limited to, situations as was the case with respect to Plaintiff, in which the commission was disproportionate as compared to the employee's quota.  (Guidotti Aff. ¶12).

63.     In accordance with IBM's policies and procedures, Plaintiff's commission on the 2006 Motorola compliance transaction in the amount of $114,963.80 was paid to him in February 2007. (Exs. AA & BB).

64.     Plaintiff internally appealed the decision with respect to the calculation and amount of his commission.  IBM's Human Resources representatives assigned to review the decision interviewed both the sales and finance teams and determined that the commission calculation was appropriate. (Ex. CC).

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000

Dated: February 25, 2010          By: _____
     New York, New York              Kevin G. Lauri  (KL 8714)
                                     Peter C. Moskowitz  (PM 8845)

                                     ATTORNEYS FOR DEFENDANT
                                     INTERNATIONAL BUSINESS
                                     MACHINES CORPORATION