UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DAVID A. KAVITZ,

               Plaintiff,

vs.

INTERNATIONAL BUSINESS MACHINES
CORPORATION, a New York corporation,

               Defendant.

Case No. 09-CV-05710-CM

## **<u>DEFENDANT IBM'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT</u>**

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000

Attorneys of Record:
Kevin G. Lauri (KL 8714)
Peter C. Moskowitz (PM 8845)

**TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ....................................................................................... iii – iv

SUMMARY OF ARGUMENT ................................................................................... 1

STATEMENT OF FACTS ......................................................................................... 2

    A.    The Parties ..................................................................................................... 2

    B.    Plaintiff's Employment with IBM ................................................................. 3

          1.    Plaintiff's Hire ................................................................................. 3

          2.    IBM's Organizational Structure ....................................................... 3

          3.    The Motorola Account ..................................................................... 4

               a. Motorola Purchased Software Licenses From IBM ..................... 4

               b. IBM's 2003 Compliance Audit of Motorola .............................. 5

          4.    Plaintiff's Compensation .................................................................. 5

    C.    Plaintiff's 2006 Plan Letter ........................................................................... 6

    D.    The 2006 Motorola Audit and Compliance Transaction ............................... 7

    E.    IBM's Calculation of Plaintiff's Commission Under Its 2006 Incentive Plan ............. 9

ARGUMENT .............................................................................................................. 11

POINT I
PLAINTIFF'S BREACH OF CONTRACT CLAIM IS DEFECTIVE AND FAILS
AS A MATTER OF LAW ........................................................................................... 11

        I. IBM'S 2006 INCENTIVE PLAN LETTER IS NOT AN
            ENFORCEABLE CONTRACT ................................................................ 12

        II. EVEN IF AN ENFORCEABLE CONTRACT EXISTED, IBM
            ACTED WITHIN ITS CONTRACTUAL RIGHTS IN CALCULATING
            PLAINTIFF'S COMMISSION ............................................................... 17

POINT II
PLAINTIFF'S VIOLATION OF FAIR DEALING CLAIM IS DEFECTIVE AND
FAILS AS A MATTER OF LAW ............................................................................... 21

**Page**

POINT III
PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIM IS DEFECTIVE AND
FAILS AS A MATTER OF LAW ............................................................................................ 23

POINT IV
PLAINTIFF'S MONEY HAD AND RECEIVED CLAIM IS DEFECTIVE AND
FAILS AS A MATTER OF LAW ............................................................................................ 24

CONCLUSION .......................................................................................................................... 25

# TABLE OF AUTHORITIES

## FEDERAL CASES

**Page**

Aledia v. HSN Nordbank,
08 Civ. 4342, 2009 U.S. Dist. LEXIS 24953 (S.D.N.Y. Mar. 23, 2009) ................................22

Bessemer Trust Company v. Branin,
498 F. Supp. 2d 632 (S.D.N.Y. 2007)...............................................................................17

Ferrari v. Keybank,
06-cv-6525, 2009 U.S. Dist. LEXIS 160 (W.D.N.Y. Jan. 5, 2009)......................17, 18, 24, 25

Gilmour v. IBM,
09-cv-04155 (C.D. Cal. Dec. 16, 2009) ...................................................................13, 16, 21

Haffner v. Bryan Cave,
98 Civ. 0552, 2000 U.S. Dist. LEXIS 11661 (S.D.N.Y. Aug. 14, 2000) ................................22

Jensen v. IBM,
454 F.3d 382 (4th Cir. 2006) ...................................................................12, 13, 14, 16, 20, 21

MacDonald v. Federal Life and Casualty Co.,
410 F. Supp. 1126 (E.D.N.Y. 1976) .......................................................................................14

O'Shea v. Bidcom, Inc.,
01 Civ. 3855, 2002 U.S. Dist. LEXIS 13225 (S.D.N.Y. July 19, 2002) ................................14

Rudolph v. IBM,
09 C 428, 2009 U.S. Dist. LEXIS 75261 (N.D. Ill. Aug. 21, 2009)...........................14, 16, 21

Sathe v. Bank of New York,
89 CIV. 6810, 1990 U.S. Dist. LEXIS 5012 (S.D.N.Y. May 2, 1990)...................................11

Welland v. Citicorp, Inc.,
00 Civ. 738, 2003 U.S. Dist. LEXIS 22721 (S.D.N.Y. Dec. 17, 2003), aff'd,
04-0624-cv, 2004 U.S. App. LEXIS 24926 (2d Cir. Dec. 3, 2004).........................................17

Wharton v. Duke Realty, LLP,
467 F. Supp. 2d 381 (S.D.N.Y. 2006)..................................................................................11

## STATE CASES

Anesthesia Group of Albany v. State of New York,
309 A.D.2d 1130, 766 N.Y.S.2d 448 (3d Dep't 2003)..........................................................24

**Page**

Angel v. Bank of Tokyo-Mitsubishi, Ltd.,
    39 A.D.3d 368, 835 N.Y.S.2d 57 (1st Dep't 2007)...........................................................23, 24

Aventine Investment Management Inc. v. Canadian Imperial Bank of Commerce,
    265 A.D.2d 513, 697 N.Y.S.2d 128 (2d Dep't 1999)................................................................21

Barker v. NYNEX Corp.,
    305 A.D.2d 233, 760 N.Y.S.2d 138 (1st Dep't 2003).....................................................14, 15, 16

Barker v. Time Warner,
    24 Misc. 3d 1213A, (N.Y. Sup. Ct. 2009) ...................................................................21, 22, 23

Budet v. Tiffany & Co.,
    155 A.D.2d 408, 547 N.Y.S.2d 81 (2d Dep't 1989)..........................................................23, 24

Foss v. AT&T,
    199 A.D.2d 668, 605 N.Y.S.2d 143 (3d Dep't 1993).....................................................15, 16, 17

Hamlin Beach Camping v. State of New York,
    303 A.D.2d 849, 756 N.Y.S.2d 354 (3d Dep't 2003)................................................................24

J&L American Enterprises v. DSA Direct,
    10 Misc. 3d 1076A, 814 N.Y.S.2d 890 (N.Y. Sup. Ct. 2006) ...................................................11

Kaufman Organization v. Graham & James,
    269 A.D.2d 171, 703 N.Y.S.2d 439 (1st Dep't 2000)..........................................................23, 24

Namad v. Salomon,
    74 N.Y.2d 751, 543 N.E.2d 722, 545 N.Y.S.2d 79 (1989)...................................................17, 18

Nikitovich v. O'Neal,
    40 A.D.3d 300, 836 N.Y.S.2d 34 (1st Dep't 2007)........................................................21, 22, 23

Rather v. CBS Corp.,
    68 A.D.3d 49, 886 N.Y.S.2d 121 (1st Dep't 2009)...........................................................23, 24

Ruderman v. Stern,
    6 Misc. 3d 1015A, 800 N.Y.S.2d 356 (N.Y. Sup. Ct. 2004) ....................................................21

Defendant International Business Machines Corporation ("IBM" or "Defendant") respectfully submits this memorandum of law in support of its Motion for Summary Judgment to dismiss the Complaint ("Complaint") of Plaintiff David A. Kavitz ("Plaintiff") in its entirety.

Plaintiff, a current employee of IBM, claims the calculation of his 2006 commission on a transaction whereby IBM's customer, Motorola, paid IBM $3.8 million in connection with its failure to properly report and pay IBM for software licenses over a three year period (and for which Plaintiff was responsible for monitoring) constituted a breach of contract and a violation of tort law.   IBM properly calculated and paid Plaintiff a commission in the amount of $114,963.80, as clearly explained in the incentive plan letter which he accepted at the outset and pursuant to which IBM retained the sole discretion to determine the amount, if any, of his commission.   As a result of the three years of underpayments, the 2006 payment from Motorola to IBM, the result of a compliance audit, was well beyond the expected Motorola license revenue for 2006.   Plaintiff's complaint asserts causes of action for Breach of Contract (Count I), Violation of Fair Dealing (Count II), Breach of Fiduciary Duty (Count III) and Money Had and Received (Count IV).

## SUMMARY OF ARGUMENT

In 2006, Plaintiff was paid a base salary and commissions on expected sales to Motorola of $1.7 million, all of which was explained in a 2006 Incentive Plan Letter (the "2006 Plan Letter") which forms the basis for Plaintiff's Breach of Contract claim (Count I).   The 2006 Plan Letter is not a contract.   In fact, the 2006 Plan Letter expressly states "**[t]he Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it.**" (Emphasis added).   Plaintiff himself admitted that the 2006 Plan Letter was not a contract and he did not identify any other document or promise supporting his breach of contract claim.   Furthermore, Plaintiff's breach of contract claim fails as a matter of law because the

1

express terms of the 2006 Plan Letter permit IBM in its sole discretion to determine the amount, if any, of Plaintiff's commission. Here, IBM properly calculated and paid Plaintiff a commission in the amount of $114,963.80, in accordance with the express terms of the 2006 Plan Letter.

Indeed, the Fourth Circuit Court of Appeals and the United States District Courts for the Northern District of Illinois and the Central District of California have each ruled on the exact question of law asserted by Plaintiff in this case and held that as a matter of law IBM's incentive plan/quota letters do not create enforceable contracts.

Plaintiff's three (3) other causes of action are also not sustainable under settled New York Law. As to Count II, Plaintiff's claim for violation of fair dealing fails because absent an enforceable contract (which does not exist in this case) there is no separate cause of action in New York for violation of fair dealing. As to Count III, Plaintiff's breach of fiduciary duty claim is also fatally flawed. Not only is it impermissibly duplicative of his contract claim, but since Plaintiff was an employee of IBM, his claim is defeated by settled law holding that an employer is not in a fiduciary relationship with its employees. Finally, as to Count IV, Plaintiff's claim for money had and received is defective because it is duplicative of his breach of contract claim and Plaintiff cannot establish that Defendant received money belonging to him.

Accordingly, IBM's Motion for Summary Judgment should be granted and Plaintiff's Complaint should be dismissed in its entirety.

## STATEMENT OF FACTS

The material facts relevant to the Court's determination of Defendant's Motion for Summary Judgment are set forth in Defendant's Rule 56.1 Statement of Undisputed Material Facts submitted herewith and referred herein as "SUMF."

### A.     THE PARTIES

Defendant IBM is a New York corporation and is headquartered in Armonk, New

2

York.  (SUMF ¶ 1).[1]

Plaintiff is a current employee of IBM and presently resides in Atlanta, Georgia. (SUMF ¶ 2).

### B.   PLAINTIFF'S EMPLOYMENT WITH IBM

#### 1.   Plaintiff's Hire

Plaintiff became an IBM employee in 2002 as a result of IBM's purchase of Informix.  (SUMF ¶ 3).  Plaintiff who had been assigned to the Motorola account by Informix in 2000, was the lead Informix salesperson selling data management software to Motorola. (SUMF ¶ 4).  IBM sold many other products to Motorola.  (SUMF ¶ 5).

#### 2.   IBM's Organizational Structure

In 2005 and 2006, Plaintiff's first line supervisor was Andre Temidis, the Channel Sales Manager – Central Region, Software Group.   (SUMF ¶ 6).   Plaintiff's second-line manager was Hugh Flannery, Business Unit Executive, Americas Channels Software Sales. (SUMF ¶ 7).  Both Mr. Temidis and Mr. Flannery joined IBM from Informix in 2002.  (SUMF ¶ 7).  Plaintiff's third-line manager was Denyse Cromwell-Mackey.  (SUMF ¶ 8).  Ms. Cromwell reported to Karen Smith, the Vice President of Channel Sales for the Software Group.  (SUMF ¶ 8).  Ms. Smith reported to Robert Guidotti, the Vice President of the Software Group.  (SUMF ¶ 8).   Steve Lautz, who also reported to Mr. Guidotti, was Vice President of Information Management and his responsibility included Channel Sales involving information or data management software.  (SUMF ¶ 9).

---

[1]    References to "Moskowitz Aff. __" are to the Affidavit of Peter C. Moskowitz, Esq., sworn to on February 25, 2010, and submitted herewith.  References to "Ex. __" are to the Exhibits attached to the Moskowitz Aff.

In addition to the direct reporting relationships in the Software Group, pursuant to IBM's matrixed management structure, in 2005 and 2006, George Shanine, the Territory Sales Manager for the Central Region was also responsible for sales to Motorola. (SUMF ¶ 10). Finally, a finance team in the Software Group was responsible for setting incentive payments and quotas and reviewing commission payments. (SUMF ¶ 11). Rick Martinotti was the Field Financial Sales Manager Software S&D North America. (SUMF ¶ 11). William Sullivan was the Controller AG Software Finance. (SUMF ¶ 11). Both Mr. Martinotti and Mr. Sullivan reported to Mark Coyle, the Chief Financial Officer of the Software Group. (SUMF ¶ 12).

### 3. The Motorola Account

From 2002 to 2009, Plaintiff was the lead IBM salesperson selling OEM (original equipment manufacturer) data management software to Motorola. (SUMF ¶ 13). Motorola was by far Plaintiff's largest account and nearly all of his sales were to Motorola. (SUMF ¶ 13). OEM software products manufactured by IBM and sold to customers such as Motorola are incorporated within Motorola's specific applications, then re-sold to end-users under the Motorola brand name. (SUMF ¶ 14). In this case, Motorola incorporated the data management software manufactured by IBM in software applications it in turn sold to wireless telephone companies, including Sprint. (SUMF ¶ 15).

#### a. Motorola Purchased Software Licenses From IBM

Pursuant to the parties' agreement, which was drafted and entered into between Informix and Motorola (prior to IBM's purchase of Informix), Motorola purchased licenses from IBM to use the data management software. (SUMF ¶ 16). Motorola self-reported the number of licenses it needed, which was based on number of end-users of the software, and purchased additional licenses as needed. (SUMF ¶ 17). Motorola purchased licenses at the end of each

4

calendar year at a significant discount. (SUMF ¶ 18). Accordingly, the vast majority of IBM's data management software sales to Motorola occurred in December of each year. (SUMF ¶ 19).

### b. IBM's 2003 Compliance Audit of Motorola

In 2003 Plaintiff proposed that IBM perform a compliance audit of Motorola. (SUMF ¶ 20). IBM conducted the audit of Motorola, which included Dennis Allen, an engineer, running a software program, referred to as a script, on Motorola's computer to track the number of concurrent end-users of the data management software. (SUMF ¶ 21). The audit resulted in a $3 million purchase of licenses by Motorola based on the additional number of concurrent users that were uncovered in the audit. (SUMF ¶ 22). After the 2003 compliance audit of Motorola was completed, Plaintiff did not take any steps or institute any procedures to insure that Motorola accurately reported the number of licenses it was using going forward. (SUMF ¶ 23).

### 4.    Plaintiff's Compensation

Plaintiff's compensation, as is generally the case with salespersons handling Software Group products, was based on a combination of base salary and incentive pay. (SUMF ¶ 24). Plaintiff's incentive compensation consisted primarily of commissions. (SUMF ¶ 24). Plaintiff's yearly quota and commission rates, including accelerators, were set by the finance team. (SUMF ¶ 25). Accelerators refer to increased commission percentages that apply to revenue in excess of certain thresholds set forth in the salesperson's incentive plan or quota letter. (SUMF ¶ 25). In January of each year, Plaintiff received an incentive plan letter which included his target incentive compensation, sales quota and commission rates. (SUMF ¶ 26; Ex. A).

Each incentive plan letter, including Plaintiff's 2006 Plan Letter, contained express language that it did not constitute a contract and that IBM retained the right to review and adjust the Incentive Plan, including Plaintiff's quota and commission rates. (SUMF ¶ 27;

Ex. A).   Each year, Plaintiff electronically received an incentive plan letter and e-mailed his acceptance of the terms of the incentive plan letter to Defendant.   (SUMF ¶ 28; Exs. A & B).

Plaintiff's compensation during the period between 2003 to 2007 was:   (1) 2003 – $261,589 including commission payments in the amount of $170,623; (2) 2004 – $541,357 including commission payments in the amount of $446,851; (3) 2005 – $213,219 including commission payments in the amount of $113,973; (4) 2006 – $253,565 including commission payments in the amount of $158,110; and (5) 2007 – $229,803 including commission payments in the amount of $132,775.  (SUMF ¶ 29).

### C.   PLAINTIFF'S 2006 PLAN LETTER

In January 2006, Plaintiff electronically received his 2006 Plan Letter. (SUMF ¶ 30; Ex. A).  The 2006 Plan Letter included a revenue quota of $1,725.806.00.  (SUMF ¶ 30; Ex. A).   Plaintiff's 2006 Plan Letter provided as follows with respect to its legal significance and IBM's right to modify or cancel both the Incentive Plan and the incentive payments thereunder:

> **Right to Modify or Cancel:**
> The Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it.  IBM reserves the right to adjust the Plan terms, including but not limited to any quotas and target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related incentive payments have been earned under its terms.
>
> **Advances:**
> Periodic distributions you may receive under the Plan are advances paid to you prior to your earning of the incentive.  Because Incentive Plan quotas or similar sales objectives for annual plans are designed based on full year performance results, 2006 incentives are earned on January 31, 2007, provided the following conditions have been met: (1) you have complied with the Incentive plan; (2) you have not engaged in any fraud or misrepresentation relating to any of your sales transactions or incentives; and (3) the customer has paid the invoice for the sales transaction related to your incentive.  If any of the foregoing conditions have not been met, then the incentive is not earned.  Deductions for overpayments may be made from advances paid to you up until the date those advances become earned incentives.

**Significant Transactions:**
IBM Management reserves the right to review and, in its sole discretion, adjust incentive payments associated with transactions: (1) which are disproportionate when compared with the territory opportunity or quota size; or (2) for which the incentive payments are disproportionate when compared with the individual's performance contribution toward the transactions.

(SUMF ¶ 31; Ex. A).

Plaintiff read his 2006 Plan Letter on-line including the disclaimers. (SUMF ¶ 32). Plaintiff also received information about the 2006 Incentive Plan on-line, which included the same disclaimers that were in his 2006 Plan Letter. (SUMF ¶ 33; Ex. D). Plaintiff accepted the terms of his 2006 Plan Letter and indicated his consent and acceptance by returning an electronic copy to Defendant. (SUMF ¶ 34). Plaintiff understood that the 2006 Plan Letter did not constitute a contract with IBM. (SUMF ¶ 35). Plaintiff also understood that IBM could change the Plan, his quota and the amount of his incentive payment, including if the amount of his commission was disproportionate to his quota under the Significant Transactions clause. (SUMF ¶ 36).

**D.    THE 2006 MOTOROLA AUDIT AND COMPLIANCE TRANSACTION**

In the spring of 2006, Mr. Temidis, Plaintiff's supervisor, suggested to Plaintiff that IBM perform another compliance audit of Motorola. (SUMF ¶ 37). Plaintiff told Mr. Temidis that he was concerned that it might upset Motorola. (SUMF ¶ 38). Mr. Temidis made the decision to go forward and initiated the compliance audit of Motorola in the spring of 2006. (SUMF ¶ 39). Mr. Temidis contacted Jeri Savoy, the team leader of one of IBM's compliance teams, to assist the sales team in conducting the audit. (SUMF ¶ 40). On May 9, 2006, Ms. Savoy sent Motorola a letter formally initiating the audit. (SUMF ¶ 41). Two IBM engineers, Michael Terrell and Dennis Allen, spent a week at Motorola running software scripts on Motorola's mainframe to collect data on the number of concurrent users of the data management

software.  (SUMF ¶ 42).  The audit revealed that Motorola had been severely underreporting the number of concurrent users and therefore the number of software licenses it should have been purchasing from IBM.  (SUMF ¶ 43).  On August 23, 2006, Ms. Savoy informed Motorola of IBM's initial audit findings.  (SUMF ¶ 44).  Depending on how a concurrent user was defined, the number of concurrent users and corresponding number of licenses Motorola had underreported resulted in Motorola owing IBM between $6.4 and $77 million.  (SUMF ¶ 45). After months of negotiations, including face to face meetings, telephone calls and correspondence, Motorola and IBM agreed upon a $3.8 million payment as a result of Motorola having underreported the number of licenses it had used during the period 2004 through 2006. (SUMF ¶ 46).  In addition to Plaintiff, the following IBM employees participated in the compliance audit of Motorola:  (1) Jeri Savoy - - lead on the compliance team - - she sent the initial audit letter, informed Motorola of IBM's initial findings and participated in meetings, telephone conversations and correspondence with various Motorola employees; (2) Michael Terrell - - IBM IT Specialist - - he ran the scripts at Motorola with Dennis Allen; (3) Dennis Allen - - IBM Engineer on Motorola accountant - - he ran the scripts with Mr. Terrell; (4) Andre Temidis - - Plaintiff's supervisor - - he initiated the audit, reviewed the data, and was involved in direct negotiations with Mark Ennis of Motorola and internal IBM strategy and negotiating meetings; (5) Hugh Flannery - - Plaintiff's second line manager - - he was involved in one meeting with Motorola and internal IBM strategy and negotiating meetings; (6) George Shanine - - the Territory Sales Manager for Central Region - - he attended one meeting with Motorola; (7) Victor Cohen - - IBM attorney - - he provided legal advice in connection with the negotiations; and (8) Steve Lautz - - IBM Vice President - - he signed off on and closed the deal with Motorola Vice President, Fred Wright.  (SUMF ¶ 47).

8

Motorola paid IBM $3.8 million for additional software licenses as a result of the compliance audit that uncovered Motorola's three years of underreporting the number of licenses it was using. (SUMF ¶ 48).

### E. IBM'S CALCULATION OF PLAINTIFF'S COMMISSION UNDER ITS 2006 INCENTIVE PLAN

Pursuant to the express terms of IBM's 2006 Incentive Plan, incentive payments (commissions) for transactions closed in 2006 were not earned until January 31, 2007 and the satisfaction of three conditions not relevant here. (SUMF ¶ 49; Ex. A). Specifically, Plaintiff's 2006 Plan Letter stated in pertinent part: "Because Incentive Plan quotas or similar sales objectives for annual plans are designed based on full year performance results, 2006 incentives are earned on January 31, 2007...." (SUMF ¶ 49; Ex. A). Accordingly, IBM expressly retained the right to adjust Plaintiff's commission until at least January 31, 2007. (SUMF ¶ 50; Ex. A).

Pursuant to the Software Group's policies and procedures with respect to commission payments, all commission checks over $14,000 are subject to additional review and validation. (SUMF ¶ 51). Accordingly, in December 2006, the finance group received a monthly report reflecting all commission checks over $14,000 for the month of November. (SUMF ¶ 52). Plaintiff's potential commission on the Motorola transaction in the amount of $333,192.08 (if calculated with accelerators for exceeding quota by applying higher commission rates) was included on this report known as the "top or big" check report. (SUMF ¶ 53). Mark Coyle, the C.F.O. of the Software Group, reviewed the big check report and asked Mr. Martinotti why Plaintiff was receiving such a large check. (SUMF ¶ 54). Mr. Martinotti forwarded Mr. Coyle's inquiry to Mr. Sullivan, who was responsible for assisting the Channels sales managers in their review of large commissions. (SUMF ¶ 55).

9

As the Motorola compliance transaction resulted in Plaintiff's revenue for 2006 being 236.49% of his assigned quota, Mr. Sullivan initiated discussions with Plaintiff's management team concerning the transaction and the amount of Plaintiff's commission. (SUMF ¶ 56). Mr. Temidis confirmed to the commission team within the finance group that the amount of the transaction and Plaintiff's quota number were numerically accurate. (SUMF ¶ 57). After numerous discussions, which included Mr. Temidis, Mr. Flannery, Mr. Sullivan, Ms. Cromwell, Mr. Lautz, Mr. Coyle and Mr. Guidotti, IBM made a decision with respect to the calculation and amount of Plaintiff's commission. (SUMF ¶ 58). Specifically, Mr. Flannery, based on his discussions with his supervisors and Mr. Sullivan, recommended, and Mr. Guidotti ultimately decided, to pay Plaintiff a commission on the full amount of the 2006 Motorola compliance transaction at Plaintiff's regular commission rate without any accelerators. (SUMF ¶ 59).

IBM decided to calculate Plaintiff's commission without accelerators because it was a compliance transaction that included payments over a three year period that were not new revenue and therefore not incorporated in the quota that had been set for Plaintiff for 2006. (SUMF ¶ 60). Accordingly, the amount of the commission with accelerators was disproportionate to Plaintiff's quota. (SUMF ¶ 60). If Motorola had properly self-reported its license usage during the three-year period or Plaintiff had been on top of the issue, the revenue IBM received each year would have been included in Plaintiff's quota for the following year and the large compliance transaction in 2006 would not have occurred. (SUMF ¶ 61).

The decision to adjust Plaintiff's incentive payment commission was not unique and was expressly authorized by IBM's 2006 Incentive Plan and Plaintiff's 2006 Plan Letter. (SUMF ¶ 62). IBM has adjusted incentive payments downward on numerous occasions,

including, but not limited to, situations as was the case with respect to Plaintiff, in which the commission was disproportionate as compared to the employee's quota.  (SUMF ¶ 62).

   In accordance with IBM's policies and procedures, Plaintiff's commission on the 2006 Motorola compliance transaction in the amount of $114,963.80 was paid to him in February 2007.  (SUMF ¶ 63).  Plaintiff internally appealed the decision with respect to the calculation and amount of his commission.  (SUMF ¶ 64).  IBM's Human Resources representatives assigned to review the decision interviewed both the sales and finance teams and determined that the commission calculation was appropriate.  (SUMF ¶ 64).

## ARGUMENT

### POINT I

### PLAINTIFF'S BREACH OF CONTRACT CLAIM IS DEFECTIVE AND FAILS AS A MATTER OF LAW

   A breach of contract claim requires the plaintiff to "allege that a contract existed, and must allege facts indicating that the defendant breached the terms, express or implied, of the contract." See Sathe v. Bank of New York, 89 CIV. 6810 (LBS), 1990 U.S. Dist. LEXIS 5012, at *6 (S.D.N.Y. May 2, 1990); see e.g. Wharton v. Duke Realty, LLP, 467 F. Supp. 2d 381, 393 (S.D.N.Y. 2006) (J. McMahon) ("[t]he elements of a breach of contract claim in New York are: (1) the existence of a contract; (2) performance by the party seeking recovery; (3) non-performance by the other party; and (4) damages attributable to the breach"); J&L Am. Enters. v. DSA Direct, 10 Misc. 3d 1076A, 1076A, 814 N.Y.S.2d 890 (N.Y. Sup. Ct. 2006).  Here, Plaintiff cannot establish the requirements.  First, there was **no** contract as the 2006 Plan Letter at issue expressly states that it is not an express or implied contract and does not purport to promise any monetary distributions.  Indeed, Plaintiff admits that the 2006 Plan Letter does not constitute a contract.  Second, even if there was an enforceable contract, Plaintiff cannot establish a breach

11

of its terms as the 2006 Plan Letter gives IBM the sole discretion to change the Plan and calculate the amount of any incentive payment (commission) payable to Plaintiff.

## I. IBM'S 2006 INCENTIVE PLAN LETTER IS NOT AN ENFORCEABLE CONTRACT

Three federal courts have already ruled that IBM's incentive plan/quota letters containing the same disclaimer language as is present here do not constitute enforceable contracts and dismissed as a matter of law breach of contract claims seeking increased incentive payments. Plaintiff's claim is no different and New York law compels the same result – dismissal of his breach of contract claim as a matter of law – in this case.

In Jensen v. IBM, 454 F.3d 382 (4th Cir. 2006), like here, the plaintiff closed a transaction which he claimed entitled him to a large commission under the formula set forth in his quota letter. Id. at 385. Instead of the $2.6 million Plaintiff claimed he was due under the quota letter, IBM paid him a commission of $500,000 in connection with the transaction. Id. at 386. In doing so, IBM relied upon the language contained within the plaintiff's employee quota letter which stated:

> While IBM's intent is to pay employees covered by this program according to its provisions, this program does not constitute a promise by IBM to make any distributions under it. IBM reserves the right to adjust the program terms or to cancel or otherwise modify the program at any time during the program period, or up until actual payment has been made under the program. . . . No one becomes entitled to any payment in advance of his or her receipt of the payment.

Id. at 388. Based on this language, the Fourth Circuit determined that one of the predicates of an enforceable contract, the offer, was not present since the quota letter explicitly demonstrated IBM's desire to preclude the formation of a contract. Id. Dispositively, the court held "there were no conditions that [plaintiff] could satisfy to create a binding contract before IBM decided to pay him. [Rather] IBM unambiguously characterized sales commissions as a form of

incentive pay that it intended to make but which it reserved the right to calculate or even not make, even after sales were closed." Id. Accordingly, the Fourth Circuit affirmed the District Court's dismissal of plaintiff's breach of contract claim on summary judgment. The Fourth Circuit specifically held that no enforceable contract existed, ruling that at best for the plaintiff, the incentive plan served as "a policy of payment in which [IBM] reserved discretion to itself to make the payment and to determine its amount...." Id.

In Gilmour v. IBM, 09-cv-04155 (C.D. Cal. filed Dec. 16, 2009)[2], the court, relying on exactly the same language in the 2006 Plan Letter in this case, dismissed plaintiff's breach of contract claim because the disclaimer language precluded the formation of an enforceable contract. The plaintiff filed a breach of contract action against IBM contending that her incentive plan and quota letter constituted a valid enforceable contract entitling her to certain commission payouts. Id. at 2. The plaintiff's quota letter stated:

> [The Incentive] Plan does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including but not limited to any quotas or target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related payments have been earned under its terms.

Id. at 3. Based on this language (identical to the language contained in Plaintiff's 2006 Plan Letter), the court ruled IBM could "unilaterally modify or terminate the Plan at any time, so that it is clear that IBM did not make an offer with respect to incentive compensation to [plaintiff]." Id. Therefore, the court, specifically relying on the reasoning by the Fourth Circuit in Jensen, concluded there was no valid agreement between the parties and dismissed plaintiff's breach of contract claim as a matter of law.

---

[2] Copies of decisions cited within this memorandum of law which are unavailable on WESTLAW are attached as Exhibit JJ to the Moskowitz Aff.

Finally, in <u>Rudolph v. IBM</u>, 09 C 428, 2009 U.S. Dist. LEXIS 75261, at *10-11 (N.D. Ill. Aug. 21, 2009), the court also held that as a matter of law an IBM incentive compensation plan did not constitute an enforceable contract. In <u>Rudolph</u>, the plaintiff alleged IBM breached its contract with him by failing to properly pay him commissions that were allegedly owed to him after he exceeded his sales quota. The compensation plan upon which plaintiff relied stated: "INDIVIDUAL COMPENSATION PLANS CAN BE MODIFIED OR TERMINATED AT ANY TIME FOR ANY REASON. . . ." <u>Id</u>. at *9.   Like the Fourth Circuit's decision in <u>Jensen</u>, the court held that IBM's ability to modify its compensation plans at any time precluded plaintiff from "reasonably believ[ing] that IBM made an offer with respect to incentive compensation." <u>Id</u>. at *10. The court therefore granted IBM's motion for judgment on the pleadings under Rule 12(c) and dismissed plaintiff's breach of contract claim on the basis that there was no enforceable contract. <u>Id</u>. at *9-10.

Likewise, New York courts have uniformly held that "[i]t is axiomatic that a promise to pay incentive compensation is unenforceable if the written terms of the compensation plan make clear that the employer has absolute discretion in deciding whether to pay the incentive." <u>O'Shea v. Bidcom, Inc.</u>, 01 Civ. 3855, 2002 U.S. Dist. LEXIS 13225, at *8 (S.D.N.Y. July 19, 2002); <u>see</u> e.g., <u>Barker v. NYNEX Corp.</u>, 305 A.D.2d 233, 234, 760 N.Y.S.2d 138 (1st Dep't 2003). When a compensation plan document explicitly disclaims any intent on the part of an employer to be legally bound to an employee, "[i]t is merely an illusory promise too indefinite to be enforceable." <u>See</u> <u>MacDonald v. Federal Life and Cas. Co.</u>, 410 F. Supp. 1126, 1128 (E.D.N.Y. 1976). Rather, "[i]t is merely an indefinite promise to pay [compensation] which determination is wholly optional on behalf of the promisor, and, therefore, unenforceable." <u>Id</u>.

The decision in <u>Barker</u>, 305 A.D.2d at 234, 760 N.Y.S.2d at 140, is particularly instructive here.   In <u>Barker</u>, the plaintiff asserted that he was entitled to greater incentive compensation payments than he actually was awarded. The First Department held that the employer's compensation plans clearly stated they were "statements of general intention only, [and] that they do not constitute contracts for payment of any particular amount of compensation and that the company reserves the right to reduce, modify, or withhold incentive payments at any time based on changed business conditions, individual performance or management modification.'" <u>Id</u>.   Based on the plain language unambiguously stating that the plan did not constitute a contract and that NYNEX reserved the right to change the payments at any time, the court held no enforceable contract existed and dismissed the plaintiff's breach of contract claim on summary judgment as a matter of law.   <u>Id</u>.

Likewise, in <u>Foss v. AT&T</u>, 199 A.D.2d 668, 605 N.Y.S.2d 143 (3d Dep't 1993), the plaintiff claimed the company's management wrongfully reduced his commission in violation of its contractual agreement with him.   Again, and as is the case here, the employer's compensation plan contained a disclaimer which reserved the employer's ability to "'reduce, modify, or withhold compensation or noncash awards based on...management determination of special circumstances at any time for any reason with or without prior notice.'"   <u>Id</u>. at 669. Based on this language, in conjunction with the fact that the compensation plan contained a disclaimer explicitly stating it did not purport to create contractual rights between the parties, the court ruled the plan did not "confer[] upon [plaintiff] any right to receive the amount of commissions [plaintiff] seeks" and dismissed the plaintiff's breach of contract claim as a matter of law. <u>Id</u>.

The 2006 Plan Letter, which is the sole document Plaintiff relies upon in support of his breach of contract claim, contains the same type of disclaimer and reservation of rights language that the courts held determinative as a matter of law in <u>Jensen</u>, <u>Rudolph</u>, <u>Gilmour</u>, <u>Barker</u> and <u>Foss</u>. Specifically, Plaintiff's 2006 Plan Letter states in relevant part that it:

> does not constitute an express or implied contract or a promise by IBM to make any distributions under it. IBM reserves the right to adjust the Plan terms, including but not limited to any quotas and target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related incentive payments have been earned under its terms.

(Ex. A). Based on this explicit disclaimer language, IBM did not contractually obligate itself to pay the additional commission Plaintiff claims he is entitled to in this case. In fact, IBM specifically and unequivocally reserved the right to pay Plaintiff some or none of the commissions he could have earned under the 2006 Incentive Plan.

The foregoing authority, including controlling New York case law and the three federal court decisions holding that IBM's incentive compensation plans do not constitute enforceable contracts, apply with equal force to the present case. Here, IBM's 2006 Plan Letter explicitly stated that it was not intended to create an express or implied contract. (<u>See</u> Ex. A). Furthermore, IBM maintained the sole discretion to modify or terminate the Incentive Plan at any time. (<u>Id</u>.) Therefore, IBM clearly demonstrated that it did not intend to enter into a contract with Plaintiff regarding his commissions, nor did it provide consideration for any alleged promise in connection with the 2006 Plan. Accordingly, since the 2006 Plan Letter is not an enforceable contract, Plaintiff's breach of contract claim should be dismissed as a matter of law.

## II. EVEN IF AN ENFORCEABLE CONTRACT EXISTED, IBM ACTED WITHIN ITS CONTRACTUAL RIGHTS IN CALCULATING PLAINTIFF'S COMMISSION

If the Court adopts the view that the 2006 Plan Letter constitutes some kind of enforceable contract, Plaintiff is, in that instance, bound by its terms of any such agreement which expressly permit IBM at its sole discretion to adjust or eliminate his commission. The law on this point states that when, as here, a disclaimer allows an employer to "reduce, modify, or withhold compensation…at any time for any reason with or without prior notice," the employer "unmistakably retain[s] [the] right to reduce or withhold commission payments…." Foss, 199 A.D.2d at 669, 605 N.Y.S.2d at 143; Namad v. Salomon, 74 N.Y.2d 751, 543 N.E.2d 722, 545 N.Y.S.2d 79 (1989). Further, "[w]here a bonus policy expressly reserves the right to the employer to pay or not pay bonuses, employees cannot claim a vested right or entitlement to payment of a bonus under that policy." Welland v. Citicorp, Inc., 00 Civ. 738, 2003 U.S. Dist. LEXIS 22721, at *50 (S.D.N.Y. Dec. 17, 2003) (breach of contract claim where bonus policy at issue gave the employer complete discretion to award bonuses and therefore plaintiff had no "enforceable right in a bonus"), aff'd, 04-0624-cv, 2004 U.S. App. LEXIS 24926 (2d Cir. Dec. 3, 2004); see also Bessemer Trust Company v. Branin, 498 F. Supp. 2d 632, 638 (S.D.N.Y. 2007) (dismissing plaintiff's breach of contract claim because the offer letter provided the employer absolute discretion to award plaintiff a bonus). Accordingly, Plaintiff's breach of contract claim fails irrespective of whether the 2006 Plan Letter constitutes an enforceable contract.

The decision in Ferrari v. Keybank, 06-cv-6525, 2009 U.S. Dist. LEXIS 160 (W.D.N.Y. Jan. 5, 2009) addressed a fact pattern very similar to this matter. In Ferrari, the defendant employer significantly adjusted the plaintiffs' incentive payments in order to avoid plaintiffs receiving a windfall. Id. at *10-11. While the court in Ferrari considered the defendant employer's incentive plan to be an enforceable agreement, it held that the employer did not

17

breach the incentive plan's terms because "[a]n employee cannot establish that an employer breached a contract to pay a particular amount of bonus compensation where the employer retains discretion regarding the amount of bonus compensation to be awarded." Id. at *17. The incentive plan provided that the employer maintained "the absolute and unconditional right at all times to…increase, decrease or terminate any and all incentive awards to be paid under the plan." Id. at *21. The court dismissed the plaintiffs' breach of contract claims on summary judgment, holding "I find that the plain language of the Incentive Plan at issue, defendant was unambiguously vested with absolute discretion to modify any and all award allocations and accordingly defendant was vested with the power to modify plaintiffs' incentive awards." Id. at *20.

Similarly, in Namad v. Salomon, the New York Court of Appeals was presented with a bonus clause which stated: "the amounts of other compensation and entitlements, if any, including regular bonuses, special bonuses and stock awards, shall be at the discretion of the management….Such bonuses as are awarded will be consistent with the customary policy of the company." 74 N.Y.2d at 752-753. In rejecting the plaintiff's argument and affirming the dismissal of the breach of contract claim on summary judgment, the court stated "[t]o read the second sentence of the bonus clause as binding defendants to pay plaintiff a fixed amount approximating his annual salary – as he alleges was the 'customary policy' – would render the previous sentence vesting defendants with complete discretion a nullity, and such a construction is untenable." Id. at 753.

Here, because Plaintiff's projected commission on the Motorola compliance transaction was in excess of $14,000, it was identified for review by IBM's finance team. (SUMF ¶¶ 51-53). As a result of that review, IBM decided to pay Plaintiff a total commission of

$114,963.80, calculated as Plaintiff's regular commission rate for the full $3.8 million in revenue from the transaction without accelerators - - enhanced commission rates (triple Plaintiff's regular percentage) to reward salespersons for exceeding sales quotas by generating new revenue. (SUMF ¶¶ 54-59). IBM's decision with respect to the amount of Plaintiff's commission was based upon the fact that the transaction was a result of a compliance audit and the revenue, which covered three years of underpayment by Motorola, had not been factored in to his 2006 quota. Accordingly, while IBM paid Plaintiff his regular commission on the full amount of the $3.8 million transaction, it decided not to pay him at the higher commission rate (accelerators) that went into effect under the 2006 Incentive Plan when the quota is exceeded; the rationale being that if Motorola had not been underreporting the number of licenses it was using for the past three years, the additional license revenue would have been included in Plaintiff's quota. Had Motorola accurately reported the number of licenses that it had been using between 2004 and 2006, Plaintiff would have received commission payments only at his regular commission rate without accelerators during the prior years and the 2006 compliance transaction would not have occurred. (SUMF ¶¶ 60-61).

IBM's business reason for reducing Plaintiff's commission, however, is simply not relevant here. The explicit language of the 2006 Plan Letter provides that "IBM reserves the right to adjust the Plan terms, including but not limited to any quotas and target incentives, or to cancel the Plan, for any individual or group of individuals, at any time during the Plan period up until any related incentive payments have been earned under its terms." (Ex. A). The 2006 Plan Letter is also unambiguous **that an incentive payment is not earned until January 31, 2007 at the earliest**. Furthermore, the Significant Transactions clause contained within the 2006 Plan

Letter provides IBM with the sole discretion to review and adjust Plaintiff's incentive payments.

Specifically, the 2006 Incentive Plan Letter states:

> IBM Management reserves the right to review and, in its **sole discretion, adjust incentive payments associated with transactions:** (1) **which are disproportionate when compared with the territory opportunity or quota size**; or (2) for which the incentive payments are disproportionate when compared with the individual's performance contribution towards the transactions.

(Emphasis added).

Plaintiff cannot argue that the 2006 Plan Letter constitutes an enforceable contract but then ignore its unambiguous language providing IBM with the absolute discretion to review and adjust his incentive payments. As a result, Plaintiff had no vested right or entitlement to the commissions at issue in this case. Indeed, in <u>Jensen</u>, discussed <u>supra</u>, the Fourth Circuit specifically discussed that if the quota letter was an enforceable agreement, the plaintiff was bound by the terms of his quota letter which expressively provided IBM the right to review and adjust commissions. The contractual provision in the quota letter at issue in <u>Jensen</u> was referred to as the 200 percent rule and it provided:

> Occasionally, a sales employee will be involved in a very unique transaction that is significantly larger than anything anticipated, such as when a rep with a $ 5M quota has a single transaction that is $ 12M. Due to the unusual size of these types of transactions compared with the quota assigned, IBM management reserves the right to review any single transaction that results in attainment of 2X quota or greater. Management will decide if an adjustment to the payment is appropriate based on the contribution of the sales employee to that transaction, therefore, managers should fully understand the sales employee's involvement in the transaction. Managers are encouraged to discuss these situations with employees as soon as they are identified, preferably prior to the opportunity closing.

<u>Jensen</u>, 454 F.3d at 386. The court determined that even presuming the disclaimer language contained in the plaintiff's quota letter discussed <u>supra</u> did not render the contract unenforceable, the plaintiff was bound by its terms and his breach of contract claim was defeated by the express

language of the quota letter providing IBM with the right to review and adjust plaintiff's commissions. Id. at 390.

*     *     *     *     *

In sum, Plaintiff's breach of contract claim should be dismissed as a matter of law. First, the law is clear that IBM's 2006 Plan Letter does **not** create an enforceable contract. Second, Plaintiff cannot sustain a breach of contract claim because IBM had the unfettered discretion and right to adjust the amount of Plaintiff's commission under the 2006 Incentive Plan. Accordingly, based on the decisions in Jensen, Gilmour and Rudolph, supra and controlling New York law, Plaintiff's breach of contract claim should be dismissed as a matter of law.

**POINT II**

**PLAINTIFF'S VIOLATION OF FAIR DEALING CLAIM IS DEFECTIVE AND FAILS<br>AS A MATTER OF LAW**

Plaintiff's claim for violation of fair dealing also fails because the 2006 Plan Letter provided IBM with absolute discretion to set and adjust his commissions and the duty of good faith and fair dealing cannot be used to resuscitate a defective breach of contract claim.

Under New York law a sustainable claim for the violation of the covenant of good faith and fair dealing requires "facts which tend to show that the defendant sought to prevent performance of the contract or to withhold its benefits from the plaintiff." Aventine Inv. Mgmt. Inc. v. Canadian Imperial Bank of Commerce, 265 A.D.2d 513, 513, 697 N.Y.S.2d 128 (2d Dep't 1999); see, e.g., Ruderman v. Stern, 6 Misc. 3d 1015A, 800 N.Y.S. 2d 356 (N.Y. Sup. Ct. 2004). However, "[a] claim for breach of the implied covenant of fair dealing cannot substitute for an unsustainable breach of contract claim." Nikitovich v. O'Neal, 40 A.D.3d 300, 301, 836 N.Y.S.2d 34 (1st Dep't 2007); see also Barker v. Time Warner, 24 Misc. 3d 1213A,

21

1213A (N.Y. Sup. Ct. 2009) ("[a] separate cause of action for breach of the implied covenant of good faith and fair dealing is duplicative of a cause of action for breach of contract and thus, New York does not recognize a separate cause of action for violation of the implied covenant of good faith and fair dealing.") (internal citations omitted); Aledia v. HSN Nordbank, 08 Civ. 4342, 2009 U.S. Dist. LEXIS 24953 (S.D.N.Y. Mar. 23, 2009) (citing cases). Furthermore, "the implied covenant of good faith and fair dealing is inconsistent with all aspects of an at will employee's relationship with his or her employer" See e.g., Barker, 24 Misc. 3d at 1213A (holding "no covenant of good faith and fair dealing is implied to any aspect of the Plaintiff's [at-will] relationship with the Defendants, including under the Sales Compensation Plan"); Haffner v. Bryan Cave, 98 Civ. 0552, 2000 U.S. Dist. LEXIS 11661 (S.D.N.Y. Aug. 14, 2000). Finally, because "[a]n employee has no enforceable right to compensation under a discretionary compensation or bonus plan..., a forfeiture of such compensation does not occasion a cause of action for the breach of the implied covenant of good faith and fair dealing." See Nikitovich, 40 A.D.3d at 300 citing Welland, 2003 U.S. Dist. LEXIS 22721.

In Barker, 24 Misc. 3d 1213A, as here, plaintiff alleged he was denied commission payments stemming from a transaction in which he had participated. After dismissing the breach of contract claim (because the employer retained the right to cancel or modify commissions), the court held that the plaintiff's breach of the implied covenant of good faith and fair dealing claim was not sustainable as a matter of law because it was based on the same purported contract, i.e., the commission plan and "New York does not recognize a separate cause of action for violation of the implied covenant of good faith and fair dealing." Id. at 1213A.

In the present case, Plaintiff has failed to demonstrate the requisite elements for his violation of fair dealing claim to survive summary judgment. First and most importantly, as discussed in detail above, IBM's 2006 Incentive Plan was a discretionary compensation plan that expressly reserved to IBM the right to change, modify, or cancel the plan and the amount of any incentive payment. (See Ex. A). As a result, as in Barker and Nitkovich, Plaintiff cannot successfully assert that he had a right to the commission payout he alleges IBM denied him under a wholly discretionary incentive compensation plan. Second, as discussed in Point I supra, Plaintiff's breach of contract claim is fatally defective and Plaintiff cannot save that claim by bootstrapping this duplicative cause of action. Finally, Plaintiff is an employee-at will, and thus, his relationship with the Defendant is inconsistent with the implied covenant of good faith and fair dealing.

**POINT III**

**PLAINTIFF'S BREACH OF FIDUCIARY DUTY CLAIM IS DEFECTIVE AND FAILS AS A MATTER OF LAW**

Plaintiff's breach of fiduciary duty claim fails as a matter law because: (1) no fiduciary relationship existed between Plaintiff and IBM (his employer); and (2) New York case law is clear that "[a] cause of action for breach of fiduciary duty which is merely duplicative of a breach of contract claim cannot stand." See Kaufman Org. v. Graham & James, 269 A.D.2d 171, 173, 703 N.Y.S.2d 439 (1st Dep't 2000) (internal citations omitted). Indeed, "[t]he law in [the First] Department, and indeed enunciated in every reported appellate-division-level case, is that employment relationships do not create fiduciary relationships. Simply put, '[the employer] did not owe plaintiff, as employee, a fiduciary duty.'" Rather v. CBS Corp., 68 A.D.3d 49, 886 N.Y.S.2d 121 (1st Dep't 2009); citing Angel v. Bank of Tokyo-Mitsubishi, Ltd., 39 A.D.3d 368, 370, 835 N.Y.S.2d 57 (1st Dep't 2007) (citing additional cases); see also Budet v. Tiffany & Co.,

23

155 A.D. 2d 408, 408, 547 N.Y.S. 2d 81 (2d Dep't 1989) ("an employer owes an employee at will no fiduciary duty").

Plaintiff's breach of fiduciary duty claim is defective because it is undisputed that at all relevant times Plaintiff was an employee of Defendant and therefore, no fiduciary relationship existed and between the parties. See Angel, Rather, and Budet, supra. Furthermore, since Plaintiff's fiduciary duty claim is based on and arises out of the same facts as the purported contract between the parties, it is not actionable. See, Kaufman, supra.

### POINT IV

## PLAINTIFF'S MONEY HAD AND RECEIVED CLAIM IS DEFECTIVE AND FAILS AS A MATTER OF LAW

Finally, Plaintiff's claim for money had and received should be dismissed because it is duplicative of his defective breach of contract claim and he cannot establish that IBM (which clearly had the right to set his commission) possessed any money that belonged to him. Under New York law, "[a] cause of action for money had and received is based upon unjust enrichment and is 'an obligation which the law creates in the absence of agreement when one party possesses money that in equity and good conscience [the party] ought not to retain and that belongs to another.'" See Anesthesia Group of Albany v. State of New York, 309 A.D.2d 1130, 766 N.Y.S.2d 448 (3d Dep't 2003) (internal citations omitted); see also Hamlin Beach Camping v. State of New York, 303 A.D.2d 849, 756 N.Y.S.2d 354 (3d Dep't 2003) (same). The decision in Ferrari, 2009 U.S. Dist. LEXIS 160, discussed in Point I(B) supra, is determinative on this claim as well. In Ferrari, like here, the plaintiffs asserted a claim for compensation under the company's discretionary incentive plan. In dismissing the plaintiffs' unjust enrichment claim as a matter of law, the court ruled that since the explicit language of the incentive plan gave the company both the authority and the discretion to lower the plaintiffs' compensation as it saw fit,

the unjust enrichment claim was merely duplicative of the plaintiffs' breach of contract claims which were dismissed for the same reason. Id. at *34.

In the present case, since IBM retained the unfettered right to adjust and set Plaintiff's incentive compensation under the 2006 Incentive Plan (see Ex. A), Plaintiff's claim for money had and received is duplicative of his breach of contract claim and therefore not actionable. See Ferrari, supra. Moreover, since IBM retained the right at its sole discretion to adjust his incentive compensation, Plaintiff cannot persuasively argue that the money he claims IBM denied him in fact properly belonged to him.

## CONCLUSION

For the reasons set forth herein, Defendant respectfully requests that the Court grant its Motion for Summary Judgment and dismiss the Complaint in its entirety, and for such other and further relief as the Court deems just and proper.

Respectfully submitted,

JACKSON LEWIS LLP
59 Maiden Lane
New York, New York 10038-4502
(212) 545-4000

Dated: February 25, 2010          By:      _Peter C. Moskowitz_
     New York, New York          Kevin G. Lauri (KL 8714)
                                  Peter C. Moskowitz (PM 8845)

ATTORNEYS FOR DEFENDANT
INTERNATIONAL BUSINESS
MACHINES CORPORATION